JOURNAL ENTRY AND OPINION
{¶ 1} Defendant-appellant, Timothy Holt, appeals the trial court's journal entry denying his petition for postconviction relief without a hearing. For the reasons that follow, we affirm.
 {¶ 2} Appellant was indicted on one count of aggravated murder with one- and three-year firearm specifications and one count of having a weapon while under disability. Appellant waived his right to a jury trial and the case proceeded to a trial before the court. The court found appellant guilty of aggravated murder with the attendant three-year firearm specification, and having a weapon while under disability. Appellant was immediately sentenced to twenty years to life on the aggravated murder charge, three years on the firearm specification, to be served prior to and consecutively to the aggravated murder sentence, and one year on the having a weapon while under disability charge, to be served concurrently with the aggravated murder and firearm sentence.
 {¶ 3} In his direct appeal, appellant argued that the trial court lacked jurisdiction to decide his case and that his conviction was against the manifest weight of the evidence. This court overruled his assignments of error and affirmed his conviction. State v. Holt, Cuyahoga App. No. 84432,2005-Ohio-1165.
 {¶ 4} Appellant subsequently filed a petition for postconviction relief, which the trial court denied without a hearing. This appeal follows.
 {¶ 5} The facts of this case, as set forth by this court in appellant's direct appeal, are as follows:
 {¶ 6} "On the evening of September 27, 2003, appellant went to Henry's Bar located on the corner of West 44th Street and Clark Avenue in Cleveland, Ohio. Appellant recognized a family friend, Anthony Mesic (Mesic), whom he had not seen in years. After speaking with Mesic, appellant called his mother, Latricia Koltiska (Koltiska), who also had not seen Mesic in approximately ten years. At approximately 10:30 p.m. Koltiska arrived at Henry's Bar and proceeded to reminisce and consume alcohol with Mesic. By this time appellant had left the bar. At approximately 1:45 a.m. on Sunday, September 28, 2003, Mesic and Koltiska left Henry's Bar holding hands.
 {¶ 7} "At approximately 6:00 a.m. that same morning, Shannon McCown (McCown), Koltiska's daughter, received a call from Koltiska who was confused, scared and in need of a ride home from a gas station near West 45th Street. Koltiska also called 911 and her son Brian looking for a ride. McCown picked Koltiska up and took her home. Soon after this, Koltiska's sons Brian and appellant arrived at her house. Koltiska told all three of her children that Mesic forced her to perform oral sex on him. Appellant left Koltiska's home and Koltiska told him not to do anything stupid. At this time appellant was with his friend Gary Green (Green). Appellant made a telephone call and arranged to pick up a gun at a residence near West 111th Street and Lorain Avenue. Green drove appellant to the residence and appellant picked up a .40 caliber Glock firearm. Green then drove appellant to his apartment on Hilliard Road in Rocky River. Appellant told Green he was going to confront Mesic, and Green left.
 {¶ 8} "Shortly after 8:30 a.m. appellant drove himself back to Henry's Bar and inquired as to Mesic's whereabouts. No one at the bar knew where Mesic lived. At approximately 9:18 a.m. appellant arrived at the home of Angela Perry (Perry), one of the bartenders at Henry's Bar who worked the night before, and asked if she knew where Mesic lived. Perry told appellant where Mesic's house was. At approximately 9:26 a.m. appellant's girlfriend, Claudine Stavole, called appellant's neighbor and asked if appellant was home. The neighbor told Stavole that she did not see appellant's car parked in its usual spot. Stavole asked the neighbor to call her when appellant arrived home.
 {¶ 9} "At approximately 9:30 a.m. Mesic's neighbor, William Burrows (Burrows), was outside in his yard. Burrows saw a midsized blue car stop in the street in front of Mesic's house. A white male just over six feet tall and approximately 190 pounds, wearing a hooded gray sweatshirt, got out of the car and walked to Mesic's house. Burrows heard what he thought were several firecrackers and when he looked up, he saw the same male with the hood of the sweatshirt pulled over his head walk back to the car and drive away. Moments later, Cleveland Police Officer Donald Wellinger arrived at 12103 Belden Avenue and found Mesic lying in his driveway, bleeding from gunshot wounds. Officer Wellinger also found several shell casings. When the EMS arrived on the scene, they confirmed that Mesic was dead.
 {¶ 10} "Subsequently, the Cleveland Police Department's Scientific Investigation Unit recovered eleven shell casings from the scene. Additionally, the Cuyahoga County Coroner's Office determined Mesic was shot ten times and recovered four bullets from his body. It was also determined that the weapon from which the casings and bullets were fired was a .40 caliber Glock firearm.
 {¶ 11} "At approximately 9:48 a.m. appellant's neighbor called Stavole to tell her appellant returned home driving his light blue Pontiac. From his house, appellant then called Green to pick him up. When Green arrived, appellant told him that he confronted Mesic and he "got out of control." Later that evening, appellant and Green went to Green's girlfriend Stephanie Pittman's house. Appellant asked Pittman to provide an alibi for him for the night of September 27 into the morning hours of September 28, because something bad happened to his mom. On Monday September 29, Cleveland police detectives Joselito Sandoval and Melvin Smith went to Koltiska's house to interview Koltiska and her daughter McCown. During this time appellant arrived at the house and voluntarily told the officers that he, Green and Pittman were at a bar during the early morning hours of Sunday September 29, when he received a call from his sister, McCown, telling him that their mother, Koltiska, was missing. Appellant further stated that he, Green and Pittman went to Henry's Bar and to Angela Perry's house to look for appellant's mother. Finally, appellant told the detectives that McCown called him to say that their mom was home.
 {¶ 12} "On Tuesday, September 30, Pittman told a Cleveland Police Department homicide detective that she was with appellant and Green the night of September 27 and the morning of September 28, driving around looking for appellant's mother. Subsequently, Pittman told the police that she lied and she was with neither appellant nor Green during the times in question. Both Pittman and Green testified as state witnesses at appellant's trial as part of plea agreements." Holt, supra, at ¶¶ 2-8.
 {¶ 13} In his petition for postconviction relief, appellant argued that his trial counsel was ineffective. Specifically, appellant claimed that his counsel's four-day absence from trial due to health concerns, failure to pursue a voluntary manslaughter conviction, failure to argue appellant's emotional state/mental capacity at the time of the offense, advisement that appellant not testify on his own behalf, and failure to move for a mistrial based upon his own alleged incompetence, compromised his representation. Technically, the only documentation appended to appellant's petition in support thereof was a copy of the docket for the case.[1]
 {¶ 14} In denying appellant's petition, the trial court found that the petition was barred by the doctrine of res judicata. The trial court also found that appellant did not present sufficient facts to support an ineffective assistance of counsel claim. We affirm both findings.
 {¶ 15} A petition for postconviction relief is a statutory vehicle designed to correct the violation of a defendant's constitutional rights. State v. Hessler, Franklin App. No. 01AP-1011, 2002-Ohio-3321. More specifically, R.C. 2953.21, which governs petitions for postconviction relief, provides a procedure for a person convicted of a criminal offense to claim that there was such a denial or infringement of his rights as to render the judgment void or voidable under the Ohio or United States Constitutions.
 {¶ 16} A petition for postconviction relief is a means to reach constitutional issues which would otherwise be impossible to reach because the evidence supporting those issues is not contained in the record of the petitioner's criminal conviction.State v. Murphy (Dec. 26, 2000), Franklin App. No. 00AP-233. Although designed to address claimed constitutional violations, the postconviction relief process is a civil collateral attack on a criminal judgment, not an appeal of that judgment. State v.Calhoun, 86 Ohio St.3d 279, 281, 1999-Ohio-102, 714 N.E.2d 905;State v. Steffen, 70 Ohio St.3d 399, 410, 1994-Ohio-111,639 N.E.2d 67. A petition for postconviction relief, thus, does not provide a petitioner a second opportunity to litigate his or her conviction, nor is the petitioner automatically entitled to an evidentiary hearing on the petition. State v. Jackson (1980),64 Ohio St.2d 107, 110, 413 N.E.2d 819.
 {¶ 17} Pursuant to R.C. 2953.21(C), before granting an evidentiary hearing on the petition, "the trial court shall determine whether there are substantive grounds for relief."Calhoun, supra, at 282-283. In order to be entitled to a hearing on a petition for postconviction relief which alleges ineffective assistance of counsel, "the petitioner bears the initial burden * * * to submit evidentiary documents containing sufficient operative facts to demonstrate the lack of competent counsel and also that the defense was prejudiced by counsel's ineffectiveness." Jackson, supra, at 111.
 {¶ 18} In Calhoun, the Supreme Court held that, "in reviewing a petition for postconviction relief filed pursuant to R.C. 2953.21, a trial court should give due deference to affidavits sworn to under oath and filed in support of the petition, but may, in the sound exercise of discretion, judge their credibility in determining whether to accept the affidavits as true statements of fact." Id. at 284. The Calhoun court added, "to hold otherwise would require a hearing for every postconviction relief petition." Id. Factors that a trial court should consider in this determination include, but are not limited to:
 {¶ 19} "* * * (1) whether the judge reviewing the postconviction relief petition also presided at the trial, (2) whether multiple affidavits contain nearly identical language, or otherwise appear to have been drafted by the same person, (3) whether the affidavits contain or rely on hearsay, (4) whether the affiants are relatives of the petitioner, or otherwise interested in the success of the petitioner's efforts, and (5) whether the affidavits contradict evidence proffered by the defense at trial. Moreover, a trial court may find sworn testimony in an affidavit to be contradicted by evidence in the record by the same witness, or to be internally inconsistent, thereby weakening the credibility of that testimony. * * *." Id. at 285.
 {¶ 20} Additionally, "where a petitioner relies upon affidavit testimony as the basis of entitlement to postconviction relief, and the information in the affidavit, even if true, does not rise to the level of demonstrating a constitutional violation, then the actual truth or falsity of the affidavit is inconsequential." Id. at 284.
 {¶ 21} As previously mentioned, in ruling upon appellant's petition for postconviction relief, the trial court found that his ineffective assistance claim was barred by res judicata. In this appeal, appellant argues that res judicata did not bar his claim because there was evidence de hors the record that was relevant to his claim.
 {¶ 22} "Res judicata is applicable in all postconviction relief proceedings." State v. Szefcyk, 77 Ohio St.3d 93, 95, 1996-Ohio-337, 671 N.E.2d 233. In State v. Perry (1967),10 Ohio St.2d 175, 226 N.E.2d 104, the Supreme Court of Ohio stated:
 {¶ 23} "Under the doctrine of res judicata, a final judgment of conviction bars a convicted defendant who was represented by counsel from raising and litigating in any proceeding except an appeal from that judgment, any defense or any claimed lack of due process that was raised or could have been raised by the defendant at the trial, which resulted in that judgment of conviction, or on an appeal from that judgment." Id. at paragraph nine of the syllabus.
 {¶ 24} Appellant's claims that his counsel's failure to pursue a voluntary manslaughter conviction, failure to argue appellant's emotional state/mental capacity at the time of the offense, and failure to move for a mistrial based upon his own alleged incompetence, are all claims that existed at the time of direct appeal and that he failed to raise in his direct appeal. Thus, these claims of appellant were barred by res judicata.
 {¶ 25} Further, while the above-mentioned claims of appellant were barred by res judicata, the trial court still properly denied his petition relative to his allegations that counsel's health and advisement that appellant not testify on his own behalf compromised his representation.
 {¶ 26} In order to establish ineffective assistance of counsel, appellant must meet the two-part test outlined inStrickland v. Washington (1984), 466 U.S. 668, 104 S.Ct. 2052. First, appellant must demonstrate that his trial counsel's performance was deficient. Namely, appellant must show "that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687. A court reviewing an ineffective assistance of counsel claim must determine whether, under the circumstances, the acts or omissions were "outside the wide range of professionally competent assistance." Id. at 690.
 {¶ 27} Second, in order for appellant to establish ineffective assistance of trial counsel, he must demonstrate that the deficient performance prejudiced him. This requires appellant to show "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687. In other words, "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.
 {¶ 28} Even considering the affidavits as being properly appended to appellant's postconviction petition, he failed to meet the two-part Strickland test.
 {¶ 29} In his affidavit, appellant averred the following relative to his counsel's health:
 {¶ 30} "[my attorney] became distant and would just sit and stare at me when we would have meetings about my defense and witnesses I wanted to call. Their (sic) were times when I would even ask him if he was all right because he would get red in the face and his eyes would start to water. Sometimes I even thought he would be crying. On two seperate (sic) occasions during trial he told me that he forgot his notes on previous Prosecution Witnesses Testimonies. Their (sic) were days during the Trial that [my attorney] would tell me before Court started that he felt like shit. I would ask if he will be all right and he would just stare at me."
 {¶ 31} In her affidavit, appellant's mother averred that counsel was "confused and not feeling well." Without more, however, appellant has failed to produce "sufficient operative facts to demonstrate the lack of competent counsel and also that the defense was prejudiced by counsel's ineffectiveness."Jackson, supra, at 111.
 {¶ 32} We also do not find merit in appellant's claim of ineffective assistance of counsel based upon his counsel's advice that he not testify. The decision whether to take the stand is a tactical decision, to be arrived at between the defendant and his attorney. State v. Daniels (Apr. 28, 1983), Cuyahoga App. No. 45387. Appellant has not demonstrated that his counsel's advice was flawed and prejudicial to him. We will not second-guess counsel's tactics.
 {¶ 33} Moreover, notwithstanding res judicata, appellant and his mother's affidavits did not set forth sufficient operative facts to meet the two-pronged Strickland test in regard to his other claims. Appellant essentially averred in his affidavit that he did not purposely and with prior calculation and design kill Mesic. Rather, appellant avers that he shot Mesic while under the influence of sudden passion or in a sudden fit of rage. Thus, appellant contends that his trial counsel should have pursued a voluntary manslaughter defense.
 {¶ 34} In its findings of fact, the trial court made the following finding:
 {¶ 35} "(16) The Court finds that Defendant, after having been fully informed of the consequences of a finding of guilt as to the indictment in this matter and possible lesser offenses, affirmatively stated to the Court that he did not wish to pursue a plea bargain with the State of Ohio as to any lesser or inferior offenses prior to commencement of trial. (Tr. 7-10)"
 {¶ 36} Thus, based upon appellant's failure to engage in any plea negotiations with the State, the defense pursued another strategy, to wit, challenging whether the State had proved beyond a reasonable doubt the identity of the shooter. Given the posture of this case, the strategy was competent trial strategy and appellant failed to demonstrate that his attorney's performance was seriously flawed and deficient.
 {¶ 37} Further, the evidence supported a finding that the appellant acted in a deliberate and calculated manner (i.e., arranging to get the gun, stopping at his apartment first and telling Green he was going to confront Mesic, and returning to the bar to find out Mesic's whereabouts), rather than while under the influence of sudden passion or in a sudden fit of rage. Thus, appellant failed to demonstrate that the result of his trial would have been different had his counsel pursued an instruction on voluntary manslaughter.
 {¶ 38} Appellant also averred in his affidavit that he did not remember details of the events leading up to the shooting and that he did not know what it was that made him pull out the gun and shoot Mesic. There is, however, no evidence either in the record nor dehors the record that supports the proposition that appellant was suffering from a mental illness at the time he committed the offense. As the First Appellate District stated, it would be an "extreme proposition" to hold "that every time a defendant claims some inability to recollect all or part of the offense for which he is charged, his attorney must request a competency evaluation or be deemed ineffective." State v.Hedgecoth, Hamilton App. No. C0-20480, 2003-Ohio-3385, at ¶ 27.
 {¶ 39} Similarly, appellant's claim of ineffective assistance of counsel based upon counsel's failure to move for a mistrial is without merit. Counsel is not required to argue his own ineffectiveness; that is what the appellate process is for, and as already discussed, appellant failed to raise the issue at the appropriate time (i.e., in his direct appeal), when he had new counsel for his appeal.
 {¶ 40} Accordingly, the trial court properly denied appellant's petition for postconviction relief without a hearing and appellant's sole assignment of error is overruled.
Judgment affirmed.
It is ordered that appellee recover from appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Colleen Conway Cooney, P.J., and Kenneth A. Rocco, J.,concur.
[1] Appellant stated in his petition that the "[e]vidence supporting this claim is not attached because Petitioner needs the assistance of an attorney, investigator, and Psychiatrist to produce the evidence." On the same date appellant filed his postconviction petition, he also filed a motion for expert assistance, to which he attached his and his mother's affidavits.